**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MYADVERTISINGPAYS (MAP) LIMITED, an Anguillan corporation, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. _____ |
| VX GATEWAY CORP., a Texas corporation, VX GATEWAY, INC., a Panamanian corporation, VX GATEWAY LIMITED, a United Kingdom limited company, CELIA DUNLOP, an individual, and TIMOTHY MACKAY, an individual, | ) ) ) ) ) ) | |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiff MyAdvertisingPays (MAP) Limited ("MAP") respectfully submits this Complaint against VX Gateway Corp. ("VX Corp"), VX Gateway, Inc. ("VX Inc"), VX Gateway Limited ("VX Limited") (all VX Gateway entities collectively referred to as "VX Gateway"), Celia Dunlop ("Dunlop"), and Timothy MacKay ("MacKay") (collectively "Defendants").

## NATURE OF THE ACTION

1.      This case is about the recovery of $60 million of stolen money.  MAP seeks the recovery of certain assets wrongfully retained by Defendants, which rightfully belong to MAP and MAP's customers in the United States and abroad, which were fraudulently retained in violation of the payment processing agreement (the "Agreement") entered into between MAP and VX Gateway.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) as the amount in controversy exceeds $75,000.00, and the parties have complete diversity of

citizenship, with three (3) of the five (5) defendants being citizens of the State of Texas, and the remaining parties being foreign citizens.

3.      Venue is proper in this District as VX Corp maintains its headquarters in this District, Dunlop and MacKay currently reside in this District, and the acts complained of herein, including the fraudulent acts giving rise to the improper retention of assets rightfully belonging to MAP, occurred in substantial part in this District.

## PARTIES

4.      MAP is an Anguillan corporation that maintains its registered office at 201 Rogers Office Building, Edwin Wallace Rey Drive, George Hill, Anguilla, and that maintains its principal place of business at 15500 Wilson Road, Ocean Springs, Mississippi. MAP is an affiliate marketing company, which allows individuals to purchase the right to view targeted advertisements and, in return, to be paid for the viewing of the aforesaid advertisements.

5.      VX Corp is a Texas corporation that maintains its registered office at 2630 Fountain View Drive, Suite 403, Houston, Texas.

6.      VX Inc is a Panamanian corporation which maintains its headquarters at Punta Darien Street, Punta Pacifica, Oceania Business Plaza Building, Tower 1000, Level 29, Office 29A, Panama City, Panama.

7.      VX Limited is a United Kingdom limited company that maintains its registered office at 1 Aire Street, Leeds, United Kingdom.

8.      Collectively, VX Corp, VX Inc, and VX Limited form VX Gateway, which acts as a gateway services provider and provides payment portals to allow websites, like the one operated by MAP, to accept payments through their websites.  The payments are funneled through the

2

gateway portal to a payment processer, which ultimately processes customers' payments with various financial institutions.

9.     Celia Dunlop ("Dunlop") is an individual residing at 1901 Post Oak Boulevard, Apartment 502, Houston, Texas.

10.    Timothy MacKay ("MacKay") is an individual residing at 1901 Post Oak Boulevard, Apartment 502, Houston, Texas.

## GENERAL ALLEGATIONS

**I.     MAP's Business Model**

11.    MAP operates the website myadvertisingpays.com (hereinafter "Map.com"), an affiliate marketing site where individuals can purchase "credit packs" which allow them to view certain advertisements, placed on Map.com by third-parties interested in driving web traffic to their advertisements, and in exchange, these individuals are paid based on how many ads they watch.

12.    Users of Map.com, also known as "Members," purchase these credit packs on Map.com, via an online portal, which allows for payments by credit card or wire transfer from the Member's bank account.

13.    Once purchased, Members use these credit packs to gain access to various advertisements, which they view on Map.com. Once the Member has viewed the requisite number of advertisements, the credit pack matures, and the Member is able to redeem the matured credit pack for funds, which are credited to the Member's Map.com account.

14.    Once a Member accumulates a minimum threshold of funds in their Map.com account, the Member may request to withdraw funds from their account.

15.     On review and approval, funds are transferred by VX Gateway from MAP's VX Loop account[1] to the individual Member's VX Loop account, where the Member then has the ability to withdraw the funds via wire transfer to the bank account affiliated with the Member's VX Loop account.

## II.    MAP's Relationship With VX Gateway

16.     In April 2014, in order to sell credit packs, MAP contracted with VX Gateway, whereby VX Gateway would provide certain payment processing services which would allow MAP customers to purchase credit packs on Map.com with credit cards.

17.     MAP's initial contract for the provision of payment processing services was with VX Corp, a Texas entity.

18.     Thereafter, VX Gateway, then acting as VX Corp, provided the online portal on Map.com through which Members could purchase credit packs.

19.     At the time that the parties entered into the Agreement, it was MAP's understanding, based on representations made by VX Gateway, that VX Gateway itself would process payments made to MAP.

20.     VX Gateway, however, only provided the online portal itself, and outsourced all payment processing to various third-parties, the identities of which VX Gateway initially, and for an extended period of time, refused to disclose to MAP.

21.     Around the time that MAP and VX Gateway entered into the Agreement, MacKay required MAP CEO, Michael Deese ("Deese"), to sign numerous documents, including but not limited to, bank signature cards and/or power of attorney agreements allowing VX Gateway and/or

---

[1] A "VX Loop" account is operates similar to a PayPal account, where funds deposited therein appear as "available" to the account holder, however, in reality, the funds themselves are actually held in a specially designated bank account which is held and managed by VX Gateway.

4

MacKay to act on behalf of MAP and/or Deese, that MacKay stated were necessary to set-up various bank accounts to facilitate the processing of payments by MAP's customers.

22.     VX Gateway retained all the original documents signed by Deese, including but not limited to, the original copy of the Agreement and any and all documentation necessary for setting-up various bank accounts on behalf of MAP.

23.     VX Gateway provided no copies of any of the formational documents including, but not limited to, the Agreement to MAP.

24.     The manner in which VX Gateway processed credit card payments of Members is as follows: (1) the Member would enter his credit card information into the portal provided on Map.com by VX Gateway, (2) VX Gateway would transfer the Member's payment information to a third-party payment processor to process the payment, (3) the third-party processor would remit, less any holdbacks, the processed payment to VX Gateway, and (4) VX Gateway would place the monies received from the third-party processor into MAP's VX Loop account.

25.     Monies placed in MAP's VX Loop account were accessible to MAP, however, VX Gateway accessed those funds for the purpose of making payments to Members when they sought to withdraw funds from their own VX Loop accounts.

26.     MAP did not maintain an independent corporate bank account separate and apart from MAP's VX Loop account.  Rather, MAP used its VX Loop account to both manage MAP funds and to review sales and transaction data for purchases made on Map.com.

27.     When a Member sought to withdraw funds from their VX Loop account, the Member would make a request via VX Gateway's portal on Map.com, and after such a request was reviewed by MAP for fraud, the withdrawal was authorized, and monies would be disbursed to the Member from MAP's VX Loop account.

5

**III.     MAP Withdraws from the U.S. Market**

28.     Initially, MAP operated in both the United States and throughout Europe, however, MAP was only able to accept payments in U.S. Dollars ("USD").

29.     In or around December 2015, MAP began to notice that the vast majority of their customer base was in Europe, and that the profit margins for U.S. MAP Members was shrinking; this prompted MAP to begin considering withdrawing from the U.S. market.

30.     In February 2016, MAP announced that it would soon be withdrawing from the U.S. market, that it would be settling the accounts of all U.S.-based MAP Members, in advance of relaunching MAP with a focus on the European market, and further, that it would cease accepting payments in USD and begin accepting payments only in Euros ("EUR").

31.     Shortly thereafter, VX Gateway began placing restrictions on MAP transactions, including an annual limit on credit card transactions per Member of Six Thousand Dollars ($6,000.00).

32.     Prior to the restriction, MAP was unaware of any restrictions placed on MAP transactions, and MAP Members frequently made purchases in excess of Six Thousand Dollars ($6,000.00).

33.     On February 24, 2016, Lynne Booth ("Booth"), MAP's Executive Secretary, sent an e-mail to Dunlop inquiring as to why the restrictions had been put into place, and for how long such restrictions would be necessary.

34.     Dunlop responded that same day, indicating that the restriction had been introduced by VX Gateway's "first processor," and that it was a permanent restriction for transactions processed by that processor.

6

35.    Dunlop further explained, however, that VX Gateway had retained a second processor, albeit at a higher transaction fee, and would begin routing MAP transactions to that second processor once a Member processes in excess of Six Thousand Dollars ($6,000.00) of payments with the first processor.

36.    This marked the first time that VX Gateway indicated that it was not actually processing MAP transactions, and that said transactions were being processed by third-party processors.

37.    At the same time that VX Gateway implemented the new restriction on MAP transactions, MAP began receiving complaints from Members indicating that it was taking longer to withdraw and to clear and deposit funds into their respective bank accounts.

38.    On February 26, 2016, Booth again sent an e-mail to Dunlop, inquiring about the delay with the processing of Member withdrawals.

39.    Dunlop responded that the issue was not with VX Gateway, but was rather the fault of the "correspondent bank," Standard Chartered of New York.

40.    Around that same time, Dunlop represented to Deese that VX Gateway was seeking to contract with additional banks to process MAP payments, and that VX Gateway was attempting to set-up additional accounts on MAP's behalf.

41.    On March 16, 2016, Dunlop sent an e-mail to Deese, forwarding certain questions, purportedly from a prospective processor seeking, *inter alia*, the status of MAP corporations in the United Kingdom and the United States, as well as three months of corporate bank statements for MAP.

7

**IV.     MAP Begins Accepting Payments in EUR**

42.     On April 5, 2016, MAP relaunched Map.com, ceased accepting payments in USD, and began accepting payments solely in EUR, seemingly through a single processor provided by VX Gateway.

43.     On April 7, 2013, Dunlop sent an e-mail to Deese and Booth, informing them that VX Gateway had contracted with a second processor to process MAP transactions in EUR, albeit only for MasterCard payments; however, Dunlop further indicated that VX Gateway was seeking an additional processor to process Visa payments, and that VX Gateway expected to find the processor within a couple weeks.

44.     Despite initiating processing of EUR payments on April 5, MAP quickly noticed that no cleared funds were being deposited into MAP's VX Loop account.

45.     On April 13, 2016, Booth sent an e-mail to Dunlop to inquire as to why MAP's VX Loop account showed a zero balance in EUR, despite MAP accepting EUR payments for over a week.

46.     Dunlop responded the same day, noting that the zero balance was correct because the funds in question had not yet cleared the third-party processor, and that funds would not begin showing in MAP's VX Loop account until at least three weeks after payments in EUR were initiated.

47.     Dunlop explained the delay was due to a ten percent rolling reserve holdback (the "RRH") from the third-party processor, as well as an unexplained ninety percent holdback initiated at the whim of the various processors, with one purportedly holding back funds for around three weeks, and the other holding back funds for around seven weeks.

8

48.     The RRH is fairly standard in the payment processing industry, and is designed to insulate the processor from potential refunds or fraud claims made by purchasers.

49.     The RRH allows the processor to withhold payment of ten percent of the total amount processed for a period of six months. After six months, funds withheld as an RRH are released and remitted to the merchant.

50.     While VX Gateway was able to authorize Member withdrawals in EUR, to date, no EUR funds have been made available to MAP for withdrawal.

51.     MAP's inability to access funds in its VX Loop account became increasingly problematic given that at the same time MAP ceased accepting payments in USD, VX Gateway implemented a $5,000.00 monthly withdrawal limit.

52.     On April 13, 2016, Booth sent an e-mail to Dunlop seeking explanation for the new restriction because it was preventing MAP from withdrawing funds necessary to pay MAP's monthly overhead expenses.

53.     Dunlop explained that the monthly withdrawal limit was "a system restriction" which Dunlop was unable to override, and further, that the available funds visible in MAP's VX Loop account were not actually available, as most of those funds "are either in the Reserve held by the banks, or the funds held back by the processors, or [said funds have] already been withdrawn to MAP bank accounts ($8M)."

**V.     VX Gateway Improperly Withdraws Funds from MAP's VX Loop Account**

54.     On May 6, 2016, VX Gateway withdrew approximately four million dollars from MAP's VX Loop account.

55.     That same day, Dunlop sent an e-mail to Deese and Booth, informing them that "you are going to see a very reduced VXLOOP balance," and attributed the withdrawal of funds

9

to VX Gateway's decision to increase various reserve accounts held by VX Gateway on behalf of MAP, purportedly as a way of insulating VX Gateway from chargebacks or refunds initiated by MAP Members.

56.     Late that day, during a previously scheduled lunch meeting between executives of MAP and VX Gateway in Leeds, United Kingdom, MAP asked MacKay about the unexpected withdrawal.

57.     MacKay acknowledged the improper withdrawal, and stated that it had been in error, and that VX Gateway would repay MAP over time in biweekly $600,000.00 installments.

58.     One week later, on May 13, 2016, VX Gateway paid one such installment when it released $615,000.00 to MAP's VX Loop account.

59.     Shortly thereafter, on May 16, 2016, Dunlop informed Booth that VX Gateway had ceased making payments in USD entirely, and that VX Gateway was unable to transfer any USD funds which MAP held in its VX Loop account.

60.     Since then no additional money that was improperly withdrawn from MAP's VX Loop account by VX Gateway has been repaid.

**VI.     MAP Discovers VX Gateway's Fraud**

61.     As a result of the problems MAP was experiencing with VX Gateway, MAP began searching for a new payment processor.

62.     On June 8, 2016, representatives of MAP met with representatives from a payment processor in Chicago, Illinois to discuss the possibility of the processor providing processing services for MAP.

10

63.     During that conversation, representatives from the payment processor informed MAP that the processor would need numerous months of MAP bank statements to better understand its business and the volume of processing which MAP required.

64.     At that time, MAP informed the representatives from the payment processor that MAP had never received statements from VX Gateway, and that MAP did not maintain a bank account independent of MAP's VX Loop account.

65.     A representative from the payment processor informed MAP that VX Gateway was a gateway services provider, and that they were unauthorized to process payments made through the portal installed on Map.com, and that any such payments would necessarily be processed through a third-party processor.

66.     MAP's representatives informed the processor that MAP was under the impression that VX Gateway was MAP's payment processor, and that VX Gateway had never informed MAP of any third-parties with whom VX Gateway had contracted with for payment processing services.

67.     Once MAP realized the severity of the problem with VX Gateway it spent the next few months attempting to negotiate the release of its funds held by VX Gateway.

68.     On August 4, 2016, Deese sent an e-mail to Dunlop, stating that VX Gateway was not holding-up its end of the bargain, and that it had been improperly withholding USD funds due and owing to MAP, and had not remitted funds processed in EUR, despite MAP having cleared approximately €16,500,000.00 since April 2016.

69.     Sometime thereafter, VX Gateway represented to MAP that they had sent a letter to one of the processors demanding release of the funds due and owing to MAP, however, VX Gateway claimed that the processor requested two additional weeks to respond to the letter.

70.     Later that month, on August 25, 2016, Booth sent an e-mail to Dunlop seeking an update on the processor's response, and whether or not the processor would soon be releasing USD funds due and owing to MAP.

71.     Dunlop responded, stating that VX Gateway's counsel had sent a letter to the processor, and had given them until August 30, 2016, to resolve the issue and release funds due and owing to MAP.

72.     On August 31, 2016, Booth again followed up with Dunlop, again seeking an update as to the status of MAP's USD funds.

73.     Dunlop responded, stating that the processor has requested an additional two weeks to respond, and that VX Gateway did not anticipate that any USD funds would be released prior to the response.

**VII.    VX Gateway Bars MAP from MAP's VX Loop Account and Releases Third-Party Processor Statements**

74.     MAP ultimately requested that its corporate counsel issue a demand for the funds withheld by VX Gateway, which prompted a telephone call between MAP's counsel and Dunlop and MacKay on September 7, 2016.

75.     On the call, MAP's counsel sought an explanation of why these funds had been withheld and the status of the funds, to which VX Gateway responded that everything was the fault of the processor and that the processor had the ability to freeze any MAP accounts for a period of two years while any claims to the funds were settled.

76.     MAP's counsel also sought certain information from VX Gateway including, but not limited to, the following: (i) the identity of the third-party processor(s); (ii) statements reflecting the volume of funds processed by said processor(s); (iii) statements reflecting the

12

volume of funds remitted to VX Gateway by said processor(s); and (iv) statements reflecting the volume of funds remitted to MAP's VX Loop account by VX Gateway.

77.     Thereafter, on September 20, 2016, VX Gateway released certain statements from two (2) third-party payment processors GPN Data, a Polish company, and BeCash, a Mauritius company.

78.     At the time that they released the GPN Data and BeCash statements, VX Gateway locked MAP out of MAP's VX Loop account, which prevented MAP from reviewing any of the transactional or sales data, which would have been necessary to properly contextualize the statements.

79.     The statements from GPN Data indicated that all payments processed in USD were to be paid to the account of VX Gateway Inc. at an account held by Raiffeisen Bank in Poland (IBAN #PL69175000090000000025995047).

80.     The statements from GPN Data further indicated that all payments processed in EUR were to be paid to the account of VX Gateway Inc. at an account held by Raiffeisen Bank (IBAN #PL10175000090000000025995139).

81.     The statements from BeCash did not indicate a specific account to which payments processed by BeCash were paid, however, the statements did indicate that the funds were paid to Banco Sabadell in Spain.

82.     While these statements showed that both GPN Data and BeCash had withheld the standard RRH, it did not show any additional holdbacks, such as the ninety percent  holdback described by Dunlop in her April 13, 2016 email.

13

83.   Additionally, the total amounts processed in the statements provided by VX Gateway did not total the amount of sales initiated on Map.com.[2]

| Currency | Total Sales | Total Processed | Difference |
|----------|-------------|-----------------|------------|
| USD | $ 133,408,963.37 | $ 94,320,924.81 | $ 39,088,038.56 |
| EUR | € 35,053,272.03 | € 19,009,995.64 | € 16,043,276.39 |

**Figure 1**

84.   From April 2014 through April 2016, MAP made $133,408,963.37 in sales.

85.   For that same period, the statements provided by VX Gateway indicated that GPN Data and BeCash processed $94,320,924.81, leaving an unaccounted for discrepancy of Thirty-Nine Million Eighty-Eight Thousand Thirty-Eight Dollars and Fifty-Six Cents ($39,088,038.56).

86.   From April 2016 through September 2016, MAP made €35,053,272.03 in sales.

87.   For that same period, the statements provided by VX Gateway indicated that GPN Data and BeCash processed €19,009,995.64, leaving an unaccounted for discrepancy of €16,043,276.39.

88.   On information and belief, this discrepancy shows that VX Gateway has used at least one additional payment processor which has not yet been disclosed to MAP.

## VIII.   VX Gateway Claims to Enter Dissolution

89.   In addition to producing statements from third-party processors, VX Gateway informed MAP's counsel that VX Gateway had purportedly been placed in dissolution in Panama, and that MAP should consult with VX Gateway's "liquidator," a Maltese attorney whom VX Gateway explicitly stated did not represent VX Gateway in a corporate capacity, who was retained solely for the purpose of facilitating VX Gateway's liquidation.

---

[2] The discrepancy between Map.com sales and funds processed by GPN Data and BeCash is illustrated in Figure 1.

90.     In a conversation between MAP's counsel and representatives of VX Gateway, including MacKay, Dunlop, and the Maltese liquidator, VX Gateway represented to MAP, *inter alia*, (i) that the statements from GPN Data were fraudulent, (ii) that GPN Data had not transferred the amount of money shown on the statements, and (iii) that VX Gateway had initiated legal proceedings against GPN Data in Poland, purportedly for the recovery of funds allegedly withheld from VX Gateway by GPN Data.

91.     At that time, VX Gateway also encouraged MAP to file a claim through a portal on VX Gateway's website, which was purportedly designed for creditors to make claims during the supposed Panamanian liquidation.

92.     VX Gateway further advised MAP to "join forces" with VX Gateway in their purported lawsuit against GPN Data in Poland.

93.     In order to facilitate this joining of forces, as a condition precedent, VX Gateway insisted that MAP execute a full release of liability for any claims MAP may have against VX Gateway, as well as MacKay and Dunlop personally, ostensibly because MacKay and Dunlop were concerned about being charged with international money laundering.

94.     To date, VX Gateway has neither provided, nor has MAP discovered, any evidence that VX Gateway has initiated (i) formal dissolution proceedings in Panama, or (ii) litigation against GPN Data in Poland.

95.     On information and belief, VX Gateway is attempting to deceive MAP by convincing MAP to fully release MacKay and Dunlop, supposedly so that VX Gateway and MAP can jointly seek to recover certain assets held by GPN Data.  Meanwhile, VX Gateway seeks to divert MAP's attention from monies processed by additional, unknown payment processors, which have not been disclosed to MAP, and from which VX Gateway has retained the proceeds.

**COUNT I**
**Breach of Contract – including Covenant of Good Faith and Fair Dealing**
*(against VX Gateway Corp., VX Gateway, Inc., and VX Gateway Ltd.)*

96.     MAP hereby incorporates each and every allegation of the complaint as though fully set forth herein.

97.     MAP entered into the Agreement with Defendants, as alleged above. Like every contract, this included, in addition to their express terms, an implied promise of good faith and fair dealing, not to do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

98.     MAP has performed all of the conditions, covenants, and obligations required of Plaintiff under the Agreement except to the extent that they were excused, and all the conditions of Defendants' performance were satisfied.

99.     Defendants, on the other hand, have defaulted on their obligations under the Agreement in the following respects:

> (a)     Defendants have failed to release the above-described funds to MAP, in the amount of at least $42,473,038.56 and €16,043,276.39;

> (b)     Defendants have failed to provide any accounting of the withheld funds, or to refund that amount upon demand of MAP, or to provide any valid reason as to why the funds are still being withheld.

100.    MAP was harmed as a result of the breach, and it is entitled to damages in an amount to be determined at trial.

16

## COUNT II
## Conversion
### *(against all Defendants)*

101.    MAP hereby incorporates each and every allegation of the complaint as though fully set forth herein.

102.    Defendants are withholding payment of at least $42,473,038.56 and €16,043,276.39 as described above, and failed to offer any valid explanation that would mitigate or alter Defendants' obligation to immediately tender the withheld funds to MAP.

103.    Defendants have refused to refund the withheld funds to MAP, and in so doing, Defendants have unjustifiably taken and retained money belonging to MAP.

104.    Defendants have no legal right to retain the withheld funds.

105.    MAP has therefore been damaged in an amount of at least $42,473,038.56 and €16,043,276.39, exclusive of interest, fees, and costs.

106.    Defendants were directly guilty of oppression, fraud, and malice such that each is subject to the imposition of punitive damages according to proof at trial. Each corporate defendant is liable for punitive damages for the act of its agents because each (i) had advance notice of their unfitness, (ii) authorized their wrongful conduct beforehand, and/or (iii) ratified their wrongful act afterwards, as shall be proven at trial.

## COUNT III
## Fraud
### *(against all Defendants)*

107.    MAP hereby incorporates each and every allegation of the complaint as though fully set forth herein.

108.    Defendants made numerous material representations to MAP, including but not limited to, the following:

17

(a)     Warranting and representing that Defendants would process credit card transactions in a timely manner and in good faith pursuant to the Agreement;

(b)     Representing that, after deducting their costs and fees, Defendants would provide MAP with the funds belonging to MAP and its customers;

(c)     Representing that they were unable to access MAP's funds, which were purportedly being improperly withheld by certain third-party processors;

(d)     Representing that MAP's funds, which were purportedly being improperly withheld by certain third-party processors, were frozen; and

(e)     Representing that the withdrawal of Four Million Dollars ($4,000,000.00) by Defendants from MAP's funds had been in error, and that Defendants would refund MAP over time.

109.    Each of these representations was false, as will be proven at trial.

110.    MAP reasonably relied on Defendants' representations, and would not have entered into any arrangement with Defendants in the first instance, allowed Defendants to process any monetary transaction involving MAP or its customers, or continued to allow Defendants to process any monetary transaction involving MAP or its customers had Defendants not made the aforesaid representations.

111.    As a proximate result of its reliance, MAP has suffered damages in the amounts set forth above, along with additional consequential and incidental damages to be proven at trial.

112.    Each defendant is guilty of oppression, fraud, and malice such that each is subject to the imposition of punitive damages according to proof at trial. Each corporate defendant is liable for punitive damages for the act of its agents because each (i) had advance notice of their unfitness,

18

(ii) authorized their wrongful conduct beforehand, and/or (iii) ratified their wrongful act afterwards, as shall be proven at trial.

**COUNT IV**
**Breach of Fiduciary Duty**
*(against all Defendants)*

113.     MAP hereby incorporates each and every allegation of the complaint as though fully set forth herein.

114.     It is well-settled under Texas law that courts may fashion equitable remedies such as profit disgorgement and/or fee forfeiture to remedy a breach of fiduciary duty. *See ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010).

115.     VX Gateway, MacKay, and/or Dunlop owed a fiduciary duty to MAP and/or Deese arising out of the contractual agreement between VX Gateway and MAP, as well as other agreements, such as power of attorney agreements, which granted VX Gateway, MacKay, and/or Dunlop the right to serve as agent and act on behalf of MAP and/or Deese in relation to the creation and/or management of various bank accounts to facilitate the processing of payments made to MAP.

116.     Defendants breached their fiduciary duty to MAP in numerous ways, including but not limited to, the following:

    (a)     Representing to MAP that funds, which were wired from various third-party payment processors to VX Gateway were, in fact, not wired to VX Gateway, and that the payment processors were improperly withholding funds due and owing to MAP;

19

(b)     Setting-up accounts and/or corporate entities in the name of MAP and/or Deese, and thereafter refusing to disclose the existence or location of such accounts and/or entities; and

(c)     Retaining processed funds which had already been deposited into MAP's VX Loop account.

117.    As a proximate result of the actions taken by Defendants in their capacity as MAP's fiduciary, MAP has suffered damages in the amounts set forth above, along with additional consequential and incidental damages to be proven at trial, including but not limited to, profits and/or fees earned and subsequently retained by Defendants.

118.    Herein, MAP seeks equitable remedies, including but not limited to (i) restitution of funds improperly retained by Defendants, (ii) disgorgement of profits earned by Defendants as a result of Defendants' contractual and/or fiduciary relationship with MAP, and (iii) forfeiture of fees charged by Defendants to MAP as a result of Defendants' contractual and/or fiduciary relationship with MAP.

### COUNT V
### Deceptive Trade Practices – Tex. Bus. & Com. Code § 17.41 *et seq.*
### *(against all Defendants)*

119.    MAP hereby incorporates each and every allegation of the complaint as though fully set forth herein.

120.    The Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") provides that "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *See* Tex. Bus. & Com. Code § 17.41 *et seq.*

121.    Defendants engaged in false, misleading, and deceptive acts and practices under the DTPA. The acts were false, misleading, and/or deceptive for the reasons stated in the claim for common law fraud.

122.    MAP was injured in fact and lost money or property as a result of these false, misleading, and deceptive trade practices.

**COUNT VI**
**<u>Accounting</u>**
***(against all Defendants)***

123.    MAP hereby incorporates each and every allegation of the complaint as though fully set forth herein.

124.    MAP seeks a full accounting of all transactions that are subject to the Agreement, including identification of any and all work performed by Defendants pursuant to the Agreement and any such other accounting arising from the transactions described in this Complaint.

WHEREFORE, MAP prays for judgment as set forth below.

**<u>DEMAND FOR JURY TRIAL</u>**

125.    MAP hereby demands a trial by jury on all claims so triable.

**<u>PRAYER FOR RELIEF</u>**

MAP prays for judgment as follows:

A.    For compensatory and general damages according to proof;

B.    For contractual damages in the amount of at least $42,473,038.56 and €16,043,276.39, plus consequential damages;

C.    For equitable relief, in the form of:

    i.    Restitution of MAP's funds retained by Defendants;

    ii.    Disgorgement of profits earned by Defendants; and

21

       iii.      Forfeiture of fees charged to MAP by Defendants.

D.      For punitive damages according to proof;

E.      For such orders or judgments as may be necessary to restore to MAP and its customers the money that Defendants wrongfully acquired from them.

F.      For a complete accounting as described above;

G.      For pre and post judgment interest.

H.      For payment of costs of suit herein incurred;

I.      For reasonable attorney's fees incurred in the prosecution of this suit;

J.      And for such other and further relief as the Court may deem equitable and just.


Dated:      December 1, 2016      Respectfully Submitted,

By: _/s/ J. Cary Gray_
J. Cary Gray
Texas Bar No. 08322300
S.D. Texas Federal I.D. No. 2802
GRAY REED & MCGRAW, P.C.
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile:  (713) 986-7100
cgray@grayreed.com

ATTORNEY-IN-CHARGE FOR DEFENDANT
MYADVERTISINGPAYS (MAP) LIMITED

OF COUNSEL:

Michael A. Ackal III
Texas Bar No. 24045367
S.D. Tex. Bar No. 573925
Sandra L. Mazan (_pro hac vice_ pending)
Texas Bar No. 24083465
Meagan W. Glover
Texas Bar No. 24076769

S.D. Tex. Bar No. 1550940
GRAY REED & MCGRAW, P.C.
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile:  (713) 986-7100
mackal@grayreed.com
smazan@grayreed.com
mglover@grayreed.com

Jonathan D. Herpy (*pro hac vice* pending)
Matthew E. Vogler (*pro hac vice* pending)
HART & DAVID, LLP
360 West Butterfield Road, Suite 325
Elmhurst, Illinois 60126
Telephone: (630)395-9496
Facsimile:  (630)395-9451
jdavid@hartdavidlaw.com
mvogler@hartdavidlaw.com